## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| HOSPITAL DR. PILA on behalf of itself and all others similarly situated,<br><br>                      Plaintiff,<br><br>   vs.<br><br>BAXTER INTERNATIONAL, CSL LIMITED, and CSL BEHRING<br>                  Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Hospital Dr. Pila ("Plaintiff"), on behalf of itself and all others similarly situated, brings this action for treble damages, injunctive relief and costs of suit under the antitrust laws of the United States against Baxter International, CSL Limited, and CSL Behring ("Defendants"), and alleges as follows:

## NATURE OF CLAIM

1.      Plasma is the watery liquid in which blood cells are suspended.  It is derived from humans during blood and/or plasma donations.  The type of blood plasma obtained as a byproduct of whole blood collected during blood donations is typically referred to as "recovered plasma" and comes from unpaid volunteers.  Plasma collected from plasma donations is commonly referred to as "source plasma" and comes from paid donors.

2.      Immune globulin and Albumin (together, "Plasma-Derivative Protein Therapies") are plasma-based products used to treat patients suffering from serious illnesses such as bleeding disorders and immune deficiencies.

3.     Every year, tens of thousands of people in the United States require Plasma-Derivative Protein Therapies to treat serious illnesses.  Plasma-Derivative Protein Therapies sold in the U.S. must be made from plasma collected in the United States.

4.     Defendants are the primary developers, manufacturers and sellers of Plasma-Derivative Protein Therapies in the United States.  Defendants manufacture and sell approximately 60% of the Plasma-Derivative Protein Therapies sold in the United States.

5.     During the Class Period, Baxter sold Immune globulin in the United States under the brand names Gammagard and Polygam, among others.  Baxter sold Albumin in the United States during the Class Period under the brand name Buminate.

6.     During the Class Period, CSL sold Immune globulin in the United States under the brand name Carimune, among others.  CSL sold Albumin in the United States during the Class Period under the brand name Albuminar.

7.     Defendants collectively sell billions of dollars worth of Plasma-Derivative Protein Therapies every year in the United States.

8.     During the Class Period (defined below), Defendants engaged in a conspiracy to artificially fix, raise, maintain or stabilize the prices of Plasma-Derivative Protein Therapies in the United States by agreeing to restrict the output of Plasma-Derivative Protein Therapies.  As a result of this illegal conspiracy, Defendants were able to charge supra-competitive prices for Plasma-Derivative Protein Therapies sold in the United States, thereby injuring Plaintiff and members of the Class.

## JURISDICTION AND VENUE

9.     This action arises under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 1, 15 and 26).

10.     This Court has jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337.

11.     Venue is proper in this District pursuant to sections 4 and 12 of the Clayton Act, §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c) and(d).  Defendants are found and transact business in the District and/or the claims arose at least in part in the District.  Defendants regularly and continuously conduct business in interstate and foreign commerce between and among the United States and foreign countries.  The interstate trade and commerce relevant to this action has been carried out, in part, within the District.

## PARTIES

12.     Plaintiff Hospital Dr. Pila is a Puerto Rico corporation with its principal place of business in Ponce, Puerto Rico.  During the Class Period, Plaintiff purchased Plasma-Derivative Protein Therapies in the United States directly from one or more of the Defendants and was injured as a result of Defendants' unlawful conduct.

13.     Defendant Baxter International ("Baxter") is a Delaware corporation headquartered at One Baxter Parkway, Deerfield, Illinois, 60015.  Baxter is the leading manufacturer of Plasma-Derivative Protein Therapies, with 2008 revenues of $12.3 billion, more than 33% of which comprised its plasma-based business segment.

14.     Defendant CSL Limited is an Australian corporation with its principal place of business at 45 Poplar Road, Parkville, Victoria, 3052, Australia.  CSL Limited is the second largest supplier of Plasma-Derivative Protein Therapies in the world, with 2008 worldwide sales of approximately $2.5 billion, 37% of which came from its Americas segment (North and South America).  It is a vertically-integrated company, with plasma collection facilities in addition to drug manufacturing facilities.

15.     CSL Behring is CSL Limited's wholly-owned subsidiary headquartered at 1020 First Avenue, King of Prussia, Pennsylvania, 19406.  CSL Behring owns and operates more than 70 plasma collection facilities in the United States and Germany, and three plasma manufacturing centers, including one in Illinois.

16.     Defendants CSL Limited and CSL Behring are collectively referred to herein as "CSL."

## UNNAMED CO-CONSPIRATORS

17.     Various other companies and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of, and performed acts and made statements in furtherance of the unlawful conduct.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action under Rules 23(a), (b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and others similarly situated.  The "Class" is defined as:

> All persons or entities who purchased Plasma-Derivative Protein Therapies directly from one or more of the Defendants or their co-conspirators in the United States (the "Class"), at any time from at least January 1, 2004 through the present (the "Class Period"). Excluded from the Class are Defendants, subsidiaries or affiliates of Defendants, Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and government entities.

19.     The Class is so numerous that joinder of all members is impracticable.  Due to the nature of the trade or the commerce involved, Plaintiff believes that the members of the Class are geographically dispersed throughout the United States, and that joinder of all Class members would be impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff believes that there are at least hundreds of members of the Class and that their identities can be learned from Defendants' and their co-conspirators' books and records.

20.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class purchased Plasma-Derivative Protein Therapies during the Class Period at artificially maintained, non-competitive prices, established by the unlawful actions of Defendants and their co-conspirators.  Plaintiff and members of the Class have sustained damage in that they paid inflated prices for Plasma-Derivative Protein Therapies during the Class Period due to Defendants' conduct in violation of federal law as set forth below.

21.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and antitrust litigation.

22.    Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether Defendants conspired with each other and their co-conspirators to raise, fix, maintain or stabilize the price of Plasma-Derivative Protein Therapies in the United States by restricting output of Plasma-Derivative Protein Therapies;

(b)    Whether Defendants undertook actions to conceal their unlawful conspiracy; and

(c)    Whether Defendants' conduct violated the relevant federal antitrust laws and caused injury to the business and property of Plaintiff and the members of the Class and, if so, the proper measure of damages.

23.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications

of the questions of law and fact common to the Class.  A class action, on the other hand, would

achieve substantial economies of time, effort and expense, and would assure uniformity of

decision as to persons similarly situated without sacrificing procedural fairness or bringing about

other undesirable results.

24.    The interest of members of the Class in individually controlling the prosecution of

separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and

prosecution of the action through representatives would be unobjectionable.  Plaintiff does not

anticipate any difficulty in the management of this action as a class action.

### INTERSTATE TRADE AND COMMERCE

25.    Throughout the Class Period, there has been a continuous and uninterrupted flow

of transactions in and shipments of Plasma-Derivative Protein Therapies in interstate commerce

throughout the United States.

26.    The unlawful activities of Defendants and their co-conspirators have been within

the flow of, and have had a direct, substantial, and reasonably foreseeable effect on interstate

commerce.

### THE PLASMA-DERIVATIVE PROTEIN THERAPIES MARKET

27.    Defendants are the primary manufacturers and sellers of Immune globulin and

Albumin in the United States.  These Plasma-Derivative Protein Therapies are plasma-based

products used to treat patients suffering from numerous bleeding disorders, immune deficiencies

and other serious diseases.

28.    Immune globulin is a widely used drug that can be administered intravenously

("IVIG" or "IGIV") or subcutaneously ("SCIG").  IVIG, the more predominant form, has over

20 FDA-approved indications, and as many as 150 off-label uses.  The most common uses

involve the treatment of Primary Immunodeficiency Diseases and neurological conditions – *e.g.,* Guillain-Barre Syndrome and chronic inflammatory demyelinating polyneuropathy.

29.     Albumin is used as a blood volume expander and to prime heart valves during surgery.

30.     The U.S. market for plasma-derived products in 2007 was approximately $3.5 billion.

31.     The manufacturing process for producing Plasma-Derivative Protein Therapies ranges from seven months to one year.  It involves: (1) plasma collection; (2) plasma testing; (3) fractionation (*i.e.*, precipitation of solids by manipulation of solution pH, temperature, etc.); (4) finishing or purification; (5) quality control; and (6) lot release.

32.     The manufacturing process is highly regulated because plasma products run the risk of containing and transmitting infections.  Regulators include the U.S. Food and Drug Administration ("FDA"), state regulatory agencies and the Plasma Protein Therapeutics Association ("PPTA"), an industry self-regulatory body.

33.     The FDA must approve plasma collection centers and the plants at which Plasma-Derivative Protein Therapies are made, as well as the therapies themselves.

34.     Plasma is an expensive raw material, representing between 40 to 70% of the cost of Plasma-Derivative Protein Therapies.

35.     The annual cost for Plasma-Derivative Protein Therapies can exceed $90,000 per patient in some cases.

36.     As further set forth below, the market has substantially consolidated over the past two decades.  In 1990, there were thirteen Plasma-Derivative Protein Therapy manufacturers.  In

2003, the number of Plasma-Derivative Protein Therapy manufacturers was reduced to nine. Today, only five manufacturers produce Immune globulin and Albumin in the United States.

37.    The Federal Trade Commission ("FTC") has determined that the Plasma-Derivative Protein Therapies market operates as a "tight oligopoly."

38.    The U.S. Department of Health and Human Services ("HHS") issued a report on the IGIV market in February 2007 entitled *Analysis of Supply, Distribution, Demand, and Access Issues Associated with Immune Globulin Intravenous (IGIV)* ("HHS Report").  One of its key findings was that Immune globulin "manufacturing is a tight oligopoly in which the leading three manufacturers [CSL, Baxter and Talecris] . . . have a combined market share of around 85%."

39.    According to the HHS Report, demand for IGIV has risen sharply over the last decade.  The HHS Report found that "[t]he existence of a secondary market with high IGIV prices combined with a manufacturer instituted allocation system for IGIV are symptomatic of a market in which demand exceeds supply."

40.    Purchasers of Plasma-Derivative Protein Therapies will pay high prices if necessary to make treatment available to critically ill patients.  As a result, small changes in production levels cause dramatic swings in prices for products, and producers stand to increase profits greatly by controlling output relative to demand.

41.    Control of supply is critical to preventing price competition.  Restrained output is only profitable if the major market players participate.  Restricting the supply of Plasma-Derivative Protein Therapies serves to raise prices.

### GOVERNMENT ANTITRUST INVESTIGATION

42.    The FTC recently investigated the Plasma-Derivative Protein Therapies market and uncovered evidence suggesting the existence of an illegal price-fixing conspiracy.

43. The circumstances surrounding the FTC's investigation involved a potential acquisition of Talecris Biotherapeutics Holdings Corporation ("Talecris") by CSL. Pursuant to an Agreement and Plan of Merger, dated August 12, 2008 ("Agreement"), CSL proposed to acquire all of the outstanding voting securities of Talecris in a transaction valued at $3.1 billion.

44. The proposed acquisition was reviewed for potential anticompetitive effects by the FTC.

45. After an extensive eight month investigation, which included the collection of testimony and declarations from 21 witnesses, on May 27, 2009, the FTC filed an administrative complaint ("Complaint") to block the proposed acquisition because it would violate Section 5 of the Federal Trade Commission Act, as amended, 1 U.S.C. § 45, by (1) making CSL the world's largest maker of blood plasma products; (2) substantially reducing competition in the U.S. market for Plasma-Derivative Protein Therapies, among other plasma-based products; (3) limiting industry supply of Plasma-Derivative Protein Therapies, among other plasma-based products; and (4) causing increased prices for Plasma-Derivative Protein Therapies, among other plasma-based products.

46. As a result of its investigation, and as described more fully herein, the FTC found that Defendants controlled capacity and engaged in signaling – *i.e.*, the intentional sharing of competitive information for purposes of securing accommodating responses from competitors.

47. The FTC also found that the markets for Immune globulin and Albumin are not competitive.

48. Baxter publicly supported the acquisition, stating it would be "a positive stabilizing move within the industry."

49.    The FTC's complaint was heavily redacted at the demand of Talecris and CSL. In a motion to place the unredacted complaint on the public record, the FTC stated that the redacted "language suggests a strong possibility of ongoing coordinated interaction between firms in the plasma industry.  Evidence of transparency, interdependence, and signaling among firms is particularly relevant to the allegations in this matter.  The language at issue bears on these very important points, and demonstrates how firms used specific key words to:

- suggest to each other that increasing the production of lifesaving drugs could hurt the firms' ability to reap the significant profits they all achieved during an extended period where demand exceeded supply for the key products;

- remind each other of how, during a period when supply increased, prices and profitability for the firms in the market dropped significantly; and

- encourage each other to only increase supply incrementally to keep pace with demand, not increase supply to the extent the firms actually compete with each other for market share."

50.    In the motion, the FTC also stated that the redacted language "is similar to language that in other instances has been found to be evidence supporting an illegal price fixing conspiracy," and relied on *In Re High Fructose Corn Syrup Antitrust Litigation,* 295 F.3d 651, 662 (7th Cir. 2002) (Posner, J.) (referring to competitor as a "friendly competitor," mentioning an "understanding between the companies that ... causes [them] not to ... make irrational decisions," and querying whether competitors will "play by the rules (discipline)" can all be evidence of an explicit agreement to fix prices).

51.    CSL has opposed the motion.  The FTC has responded by stating that the redacted material does not qualify as confidential business information, and that while disclosure of the material could cause "embarrassment" and "could 'expose respondent to possible treble damages actions,'" those reasons are not sufficient to prevent disclosure.

52.     On June 8, 2009, CSL and Talecris announced that they agreed to terminate their merger agreement.  On June 15, 2009, the FTC and CSL filed a joint motion to dismiss the Complaint.

53.     Under the terms of the Agreement, if the takeover was not consummated: (1) CSL would pay $75 million to Talecris; and (2) CSL would supply Talecris with plasma for five years.

## MASSIVE CONSOLIDATION IN THE INDUSTRY

54.     In 1990, there were thirteen Plasma-Derivative Protein Therapy manufacturers. In 1999, the number of Plasma-Derivative Protein Therapy manufacturers was reduced to nine. By 2005, the number of Plasma-Derivative Protein Therapy manufacturers was further consolidated to five: CSL, Talecris, Baxter, Grifols and Octapharma.

55.     Defendants have used this massive industry consolidation as an opportunity to engage in unlawful anticompetitive conduct.  Rather than increasing competition, the reduction in the number of Plasma-Derivative Protein Therapy manufacturers has increased coordination among Defendants.

56.     From the late 1990's through the early 2000's, Baxter acquired a number of biopharmaceutical companies.  In 1997, Baxter acquired Immuno International AG, a global manufacturer of biopharmaceutical products and services for transfusion medicine.  In 2001, Baxter acquired Sera-Tec Biologicals LP, which brought Baxter's number of plasma collection centers to 111 worldwide.  In 2003, Baxter closed 26 plasma collection centers across the United States, as well as a plasma fractionation facility in Michigan.  That same year, Baxter acquired Alpha Therapeutic Corporation, but sold more plasma collection centers that had been part of the acquisition.

57.     In 2000, CSL acquired ZLB Blood Transfusion Service from the Swiss Red Cross and established ZLB Bioplasma. ZLB Plasma Services (now called CSL Plasma) was established in 2001, when CSL acquired 47 plasma collection centers and lab facilities in the United States. That same year, Aventis Behring acquired 42 plasma centers. In 2004, CSL acquired Aventis Behring, combining it with ZLB Bioplasma to create ZLB Behring. Then, in 2006, ZLB Behring acquired CytoGam.

58.     In 2005, the American Red Cross ("Red Cross") exited the business, and Baxter and the Red Cross agreed that the Red Cross would supply Baxter with plasma.

59.     Richard Feinstein, Director of the FTC's Bureau of Competition, has stated that the substantial consolidation in the Plasma-Derivative Protein Therapies market, resulting in a highly concentrated market, has led to "troubling signs of coordinated behavior."

60.     As alleged in the FTC Complaint, "the industry recognizes that controlling capacity is critical to preventing price competition and that consolidation has been an effective way to eliminate or control capacity. In fact, firms in the plasma industry have used consolidation as a tool to eliminate excess capacity and reduce supply, rather than produce benefits to consumers. CSL and Baxter each have reduced capacity following past acquisitions."

61.     On April 22, 2004, Baxter announced that it would cut plasma production by 13% and close some of its plasma collection centers. This was followed less than a month later by CSL, when on May 11, 2004, it announced that it would close one-third of its blood collection centers in the U.S., just one month after it purchased the blood products business of Aventis, a former competitor. According to Bloomberg News, CSL's Managing Director, Brian McNamee, explained that by reducing the supply of blood products, CSL would gain more control over prices.

## THE CONSPIRACY

62.    In the early 2000s, Defendants' profits were steadily decreasing in the Plasma-Derivative Protein Therapies market.  There were many players competing in the Plasma-Derivative Protein Therapies market, thus supply was ample and prices were falling.  This was beneficial to consumers of Plasma-Derivative Protein Therapies.

63.    This changed around 2004 after a period of massive industry consolidation, which resulted in a market characterized as a tight oligopoly and an opportunity for Defendants to turn the market around by concertedly manipulating output in order to raise prices.

64.    Upon information and belief, Defendants devised a plan in which they could enhance profits from the sale of Plasma-Derivative Protein Therapies.  Defendants agreed to fix, raise, maintain or stabilize prices of Plasma-Derivative Protein Therapies by restricting and/or controlling the output of such products.  They successfully effectuated this unlawful scheme by, among other things, signaling their respective behaviors to each other and sharing proprietary information amongst themselves.  By this conduct, Defendants artificially raised the prices of Plasma-Derivative Protein Therapies sold in the United States during the Class Period.

65.    Defendants' scheme came to light following the FTC's investigation of the plasma-based products industry.  According to the FTC, following the extensive consolidation in the industry, the few remaining participants "recognized that they are operating in an oligopoly in which they are better off avoiding competition, restricting supply, and raising prices."

66.    The FTC further alleged in its Complaint that "the firms are keenly aware that restrained output is profitable only if all firms cooperate."  In other words, it was not in Defendants' independent self-interest to restrain or restrict output – instead, it would be in their best economic interest to expand output in the face of increased demand in order to gain market share from their competitors.

67.     Defendants encouraged one another to increase supply only "incrementally to keep pace with demand," but no further.  As a result, Defendants essentially refused to compete for incremental sales and thus increased market share.

68.     The FTC Complaint stated that Baxter recognized that "as long as competitors are not 'irrational' and do not 'trash price and take share,' Baxter can increase supply steadily in line with market demand and keep prices high."

69.     In order to communicate their unlawful scheme, the firms engaged in signaling – *i.e.*, the intentional sharing of competitive information for purposes of securing accommodating reactions from their competitors.  The FTC found numerous examples of signaling among the Defendants.

70.     Defendants used language at public events, among other places, that suggested the existence of an illegal price-fixing conspiracy.  This language included "friendly competitor," "understanding" between companies, "irrational" decisions, "play by the rules," and "discipline."

71.     Baxter's CFO acknowledged signaling in a recent investor call, stating:

> Why any of us would, for a very short-term gain, do anything to change [the current marketplace dynamics], I just don't see why we would. It wouldn't make sense and *from everything we read and all the signals we get, there is nothing that says anyone would do that.  I think people are very consistent in the messages they deliver*, which are pretty consistent with what we have told you today.

72.     On January 24, 2008, Baxter's CEO, Bob Parkinson, stated on a Q4 2007 earnings conference call that with respect to the plasma business, "it would seem that people [competitors] are doing what they need to do to ensure that the global demand can be met *collectively* by the industry."

73.     In 2006, the Department of Health and Human Services ("HHS") investigated reports that patients were having problems obtaining Immune globulin.

74.     HHS went on to find that IGIV supplies were "being rationed" in 2005-06 to such an extent that demand exceeded the supply of the drug by at least 14%.

75.     The HHS Report also explained that "[m]anufacturers are currently allocating IGIV to their customers. Under this allocation system, most customers are expected to justify their current IGIV use to the manufacturer to maintain and/or increase their allocations."

76.     Defendants also shared competitively-sensitive business information with others in the industry. In its investigation, the FTC discovered a PowerPoint presentation compiled by Talecris CEO Alberto Martinez that was essentially identical to a presentation by CSL chief economist Sam Lovkick, including 32 of 59 slides.

77.     Plasma-Derivative Protein Therapy manufacturers closely monitor each others' activities with respect to plasma collection, manufacturing and output.

78.     They have developed sophisticated oligopoly models to estimate and predict changes in supply and demand.

79.     The FTC found that the manufacturers are "collecting and cataloging an extraordinary wealth of timely competitive information, to ensure that all are engaging in desired … behavior."

80.     Defendants also spoke publicly about their desire to raise prices.

81.     On October 18, 2007, Baxter's CFO and Corporate Vice President, Rob Davis, stated on a Q3 2007 earnings conference call that with respect to Baxter's plasma business, there was going to be "price appreciation," and that Baxter expected to see "low to mid single digit price growth over our long-range horizon."

82.     Defendants' scheme worked.  As a result of their unlawful conspiracy, Defendants were able to raise prices for Plasma-Derivative Protein Therapies during the Class Period.

83.     In a recent investor call, a Baxter executive explained that after competitors lived through the "events of the early 2000s" (referring to a period of ample supply and lower prices for Plasma-Derivative Protein Therapies), they have now returned to a time of "very good stock prices and very good returns for shareholders," indicating the success of Defendants' plan to increase prices by jointly restricting and controlling supply.

84.     Similarly, at the 2007 Plasma Protein Forum, held June 5-6 at the Hyatt Regency in Reston, Virginia, and attended by numerous industry executives, including those of Defendants, Peter Turner, PPTA Chairman and President of CSL Behring, "declared the industry to be in 'good shape' after a few bumps in the road in years past."

85.     In addition, the HHS Report found that average prices for IGIV have been steadily increasing since 2004 and the upward trend was expected to continue through 2007.

86.     For example, according to an analyst presentation by Grifols dated March 5, 2008, in 2004 the average price for liquid IVIG in the United States was approximately $42 per gram, after steadily declining from prices as high as $48 per gram in the early 2000s.  By the first half of 2006, the price had steadily risen to almost $55 a gram.

87.     According to the same Grifols presentation, the average price of Albumin in the United States was as high as $4 per gram in 1998, after which it steadily plummeted to a low of $1.18 in 2004.  Then, starting in 2004, the price steadily increased to about $2.20 a gram by mid-2006, nearly doubling in price in under two years.  The Grifols presentation also reported that

"average albumin prices have steadily increased since 2005 from U.S. $14 to around U.S. $35 per 12.5 g. vial at present."

## OTHER MARKET FACTORS SUPPORTING THE EXISTENCE OF THE CONSPIRACY

88.     Various other factors make the market for Plasma-Derivative Protein Therapies particularly susceptible to an illegal conspiracy.

### Highly Concentrated Industry

89.     A high degree of concentration facilitates the operation of a price-fixing cartel because it makes it easier to coordinate behavior among co-conspirators, and it makes it more difficult for customers to avoid the effects of collusive behavior.

90.     There are only five manufacturers of Plasma-Derivative Protein Therapies in the United States.  In 2008, Defendants comprised about 60% of the sales of IVIG in the United States.  The remaining three manufacturers of IVIG, Talecris, Grifols, S.A. and Octapharma AG, had market shares totaling about 35%.

91.     At all relevant times during the Class Period, Defendants controlled most of the sales of Plasma-Derivative Protein Therapies in the United States.  Both the Department of Health and Human Services and the FTC have described the Plasma-Derivative Protein Therapies market as "a tight oligopoly."

92.     The Herfindahl-Hirschman Index ("HHI") is a widely-accepted measure of industry concentration that economists often use to quantify the degree of market concentration.  HHI is calculated by summing the squares of companies' individual market shares within an industry.  The U.S. Department of Justice ("DOJ") considers an HHI higher than 1800 to be a highly concentrated market.

93.     The HHI for the IVIG market is approximately 2608.  The HHI for the Albumin market is approximately 2942.  These high HHIs – well over 1800 – indicate that the Plasma-Derivative Protein Therapies market is extremely concentrated and is therefore highly susceptible to collusion by manufacturers.

**Significant Barriers To Entry**

94.     A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help to facilitate the operation of a cartel.

95.     There are significant barriers to entry in the Plasma-Derivative Protein Therapy market.  In its Complaint challenging the proposed CSL – Talecris merger, the FTC alleged that each step of the Plasma-Derivative Protein Therapy manufacturing process requires substantial up-front , sunk costs, "onerous and lengthy regulatory approvals", and specialized technical expertise.  This makes entry into the Plasma-Derivative Protein Therapy market difficult.

96.     Entry into the Plasma-Derivative Protein Therapies market also requires a significant amount of intellectual property, including trade secrets relating to purification and safety, and substantial product research and development.

97.     Entry into the Plasma-Derivative Protein Therapies market is also difficult because of the significant regulatory hurdles in getting products approved by the FDA.  The FDA's regulatory requirements impose significant costs and considerable time to enter the market. The return on investment for most manufacturers takes a long time to realize, making entry into the market cost-prohibitive.

98.     Because of these high barriers to entry, no new companies have entered the market *de novo* in recent history.

99.     This market environment makes entry into the market or expansion from within unlikely to occur to a degree that is sufficient to counter the anticompetitive effects of the existing oligopoly.

### Lack Of Reasonable Substitutes

100.     The lack of available substitute products gives a potential cartel a greater chance of being successful.  When few or no substitutes for a price-fixed item are available, producers of the item can raise a product's price and maintain it over time without losing significant sales. Consumers have little choice but to pay the higher price.

101.     The product offerings of the Defendants are largely homogenous.

102.     There are no substitutes for Immune globulin available in the U.S. at any price.

103.     There are no substitutes for Albumin available in the U.S. at any price. Physicians and hospitals regard Albumin as far superior from a clinical standpoint to any potential alternatives, such as hetastarch and saline products.

104.     Plasma-derivative protein products sold outside of the U.S. are not viable alternatives for U.S. customers because the FDA requires that the plasma be U.S. plasma for FDA approval of the relevant drug therapies.

### Standardized Product With High Degree Of Interchangeability

105.     When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier to unlawfully agree on the price for the product in question, and it is easier to effectively monitor agreed-upon prices. This makes it easier to form and sustain an unlawful cartel.

106.     Pricing and other variables for Plasma-Derivative Protein Therapies are standardized.  The FTC claims this "enhance[s] the high degree of transparency in the industry."

107.    Defendants' Immune globulin Plasma-Derivative Protein Therapies are functional equivalents and essentially interchangeable.

108.    Defendants' Albumin Plasma-Derivative Protein Therapies are functional equivalents and essentially interchangeable.

### Close Business Relationships

109.    The opportunity to conspire is enhanced where there are business relationships among competitors.

110.    According to Talecris's S-1/A filed with the SEC on November 19, 2007, it obtained 33% of its plasma from CSL until June 30, 2007.

111.    In addition, pursuant to the terms of the Agreement, since the acquisition of Talecris by CSL was not consummated, CSL will supply Talecris with plasma for the next five years.

### Opportunities for Meeting Competitors

112.    Participation in trade associations can be used to foster and facilitate an unlawful conspiracy.

113.    The Plasma Protein Therapeutics Association ("PPTA") is an industry self-regulatory body that serves as the global representative of the world's leading plasma collectors and producers of plasma-derived and recombinant biological therapeutics.  Defendants are members of the PPTA, and thus have the opportunity to share information and conspire at meetings and events.

114.    Defendants are Global and North American Members of the PPTA, and their high-level executives, including Peter Turner, President of CSL Behring, and Larry Guiheen, President of Baxter BioScience serve on the PPTA's Global Board of Directors.  Mr. Turner also serves as the PPTA's president.

115.    In addition, the Global Management Committee of the PPTA comprises only three members, including one from each of the two Defendants; the North America Board of Directors of the PPTA comprises only three members, including one from each of the two Defendants; and the Source Board of Directors of the PPTA comprises only three members, including one from each of the two Defendants.

116.    The PPTA convenes its annual meeting, known as the Plasma Protein Forum, in June in the Washington, D.C. metropolitan area, and high-level executives from Defendants regularly attend.

**Cross-Hiring of Senior Personnel**

117.    Defendants hired high-level employees who formerly held strategic positions with other major plasma manufacturers.

118.    For example, Dr. Alberto Martinez, Talecris's CEO, was previously employed by CSL, where he served first as Executive Vice President and later as Head of Global Commercial Operations for its subsidiary ZLB Behring.

119.    Such conduct is particularly troublesome from a conspiracy perspective in the context of an oligopoly, such as here.  Such inter-competitor hiring facilitates the opportunity for tacit and express agreements between competitors.  This is particularly true where the employees hired previously held important senior-level positions.

**ALLEGATIONS OF ANTITRUST**
**INJURY TO PLAINTIFF AND THE CLASS**

120.    Defendants' unlawful conspiracy had and is having the following effects, among others:

(a)    prices charged to Plaintiff and the Class for Plasma-Derivative Protein Therapies have been fixed, maintained, or stabilized at higher, artificially derived, non-competitive levels;

(b)    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the sale of Plasma-Derivative Protein Therapies; and

(c)    competition in establishing Plasma-Derivative Protein Therapies prices in the United States has been unlawfully restrained, suppressed and eliminated.

121.    By reason of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the Class have sustained injury to their business or property. The injury sustained by Plaintiff and the Class is the payment of supra-competitive prices for Plasma-Derivative Protein Therapies.  This is an injury of the type that the antitrust laws were meant to punish, prevent, and redress.

## FRAUDULENT CONCEALMENT

122.    Defendants fraudulently concealed their participation in the conspiracy alleged by, among other things, engaging in secret communications in furtherance of the conspiracy, and by holding themselves out as competitors to the public, to Plaintiff, and to the Class.  Because of such fraudulent concealment, and the fact that a price-fixing conspiracy is inherently self-concealing, Plaintiff and the Class did not discover, and could not have discovered, the existence of the alleged conspiracy until the FTC's redacted Complaint was filed on May 27, 2009.

123.    Because Defendants' alleged conspiracy was kept secret until May 27, 2009, Plaintiff and the Class were previously unaware of Defendants' alleged unlawful conduct, and did not know, and could not have known, that they were paying supra-competitive prices for Plasma-Derivative Protein Therapies in the United States during the Class Period.

124.   Defendants' conspiracy was inherently self-concealing.  Defendants' acts in furtherance of the conspiracy were wrongfully concealed and carried out in a manner that precluded detection.

125.   Plaintiff and the Class could not have discovered the alleged conspiracy at an earlier rate by the exercise of reasonable diligence because of the deceptive practices and secrecy employed by Defendants and their co-conspirators.  None of the facts or information available to Plaintiff and the Class prior to May 27, 2009, would have led to the discovery of the conspiracy alleged herein, prior to that date.

126.   Plasma-Derivative Protein Therapies are not exempt from antitrust regulation, thus Plaintiffs reasonably assumed the industry was well-regulated and competitive.  Defendants' acts of concealment were sufficient to preclude a reasonable person from suspecting that Defendants' prices were supra-competitive and conspiratorial.  Therefore, Plaintiff, the class, and any reasonable person would not have been alerted to investigate the legitimacy of Defendants' pricing of Plasma-Derivative Protein Therapies prior to May 27, 2009.

127.   Defendants and their co-conspirators engaged in an anti-competitive conspiracy, which they affirmatively concealed, by:

(a)   Communicating secretly regarding output restriction of Plasma-Derivative Protein Therapies; and

(b)   Agreeing not to disclose or reveal the nature and/or substance of the acts and communications taken in furtherance of the conspiracy.

128.   As a result of Defendants' fraudulent concealment of the conspiracy, the running of the statute of limitations has been tolled with respect to any and all claims alleged by Plaintiff and the Class.

## COUNT ONE

## VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

129.    Plaintiff incorporates by reference the preceding allegations.

130.    Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

131.    The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators to fix, maintain, raise and/or stabilize prices of Plasma-Derivative Protein Therapies in the United States by, among other things, restricting or controlling output of Plasma-Derivative Protein Therapies in the United States.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

132.    As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury in that they have paid supra-competitive prices for Plasma-Derivative Protein Therapies.

## RELIEF SOUGHT

Accordingly, Plaintiff demands relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be appointed as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.    That the unlawful conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce, in violation of Section 1 of the Sherman Act;

C.      That Plaintiff and the Class recover the damages determined to have been

sustained as to each of them, trebled as provided by law, and that judgment be entered against

Defendants, jointly and severally, on behalf of Plaintiff and each and every member of the Class;

D.      That Plaintiff and the Class recover their costs of the suit, including attorney's

fees, as provided by law; and

E.      That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.

Dated:  October 9, 2009                         Respectfully submitted,


                                                  */s/ Steven A. Kanner*

                                                Steven A. Kanner
                                                Douglas A. Millen
                                                **FREED KANNER LONDON & MILLEN LLC**
                                                2201 Waukegan Road, Suite 130
                                                Bannockburn, IL 60015
                                                Tel: (224) 632-4500
                                                Fax: (224) 632-4521

                                                Hollis L. Salzman
                                                Bernard Persky
                                                Gregory S. Asciolla
                                                **LABATON SUCHAROW LLP**
                                                140 Broadway
                                                New York, NY 10005
                                                Telephone: 212.907.0700
                                                Fax: 212.818.0477
                                                hsalzman@labaton.com
                                                bpersky@labaton.com
                                                gasciolla@labaton.com

                                                Stephen M. Dampier
                                                **VICKERS, RIIS, MURRAY AND CURRAN,
                                                L.L.C.**
                                                Regions Bank Building

56 Saint Joseph Street, Eleventh Floor
Post Office Drawer 2568
Mobile, AL 36652-2568
Telephone:  251.432.9772
Facsimile: 251.432.9781